RODMAN, Appellant, vs. RODMAN and others, Respondents.

*November 30 — December 17, 1901.*

*Oral contract to devise lands: Evidence: Specific performance: Possession: Statute of frauds.*

1. In an action to enforce specific performance of an alleged oral contract by plaintiff's father to will to him certain portions of a large farm which plaintiff subsequently lived upon with his father and operated on shares for many years, the evidence (discussed in the opinion) is *held* to sustain a finding that the alleged contract was not made.
2. Plaintiff's possession in such case, being subordinate to his father's possession and due to the sharing agreement, was not such as would warrant the enforcement of specific performance of the oral contract if it had been made.
3. An oral agreement to devise lands in consideration of services to be performed is not taken out of the statute of frauds by the mere performance of the services, although they be of a personal nature.

APPEAL from a judgment of the circuit court for Walworth county: FRANK M. FISH, Circuit Judge. *Affirmed.*

This is an action to enforce the specific performance of an alleged oral contract to will real estate. In the year 1873, and for a number of years prior thereto, Robert L. Rodman, deceased, owned a farm of about 500 acres in

Walworth county, Wisconsin, upon which he lived with his wife, and which he had carried on for a number of years. He was at that time sixty-seven years of age, and had a number of children, who were all adults and were living away from home. The names of his children are: Garrett Rodman and *Francis Rodman*, both of whom resided in the immediate neighborhood; *Mary Courtney* and *Margaret Greenman*, married daughters, who also lived in the vicinity; *Melissa Rodman*, a daughter who lived in California; and *Winfield Rodman*, the plaintiff, who was the youngest son, and was then twenty-two years of age. Four hundred and sixty-one acres of the farm lay in one body in the town of Walworth, and consisted of 160 acres, with the dwelling-house and barns, called the " home farm," eighty acres called the " northwest eighty," and 221 acres of adjoining lands. The remaining forty acres owned by Rodman lay in the town of Sharon, and was called the " wood lot." In 1871 or 1872 Robert L. Rodman made a will, in which he gave the " home farm," of 160 acres, and ten acres of the Sharon " wood lot," to his son *Winfield*.

In the spring of 1873 Robert L. Rodman desired to cease the active operation of the farm, and made an arrangement with his son *Winfield*, the plaintiff, who had been working away from home for a year or so, by which *Winfield* was to operate the farm on shares, and they were both to live in the homestead. Soon after this arrangement was made, *Winfield* was married, and proceeded to carry on and manage the farm on shares until the time of Robert L. Rodman's death, which took place in December, 1895, he then being nearly ninety years of age. During all of this time the plaintiff and Robert L. Rodman lived upon the homestead, the plaintiff doing the work necessary to the operation of the farm and the gathering of the crops, but the father remaining the final director of farm operations, in that he dictated what kind of crops should be raised, rented

parts of the farm to third persons at various times, and deeded two acres of the Sharon "wood lot" to a third person. The father also made and paid for all substantial repairs and improvements in the place, and paid all taxes, except the road tax, which was worked out by the plaintiff.

In the year 1881 Robert L. Rodman attempted to make another will, by which he devised the "home farm," of 160 acres, the "northwest eighty," and ten acres of the Sharon "wood lot," to *Winfield*, charged with the payment of $1,000 each to the daughters *Mary* and *Melissa*. This will was unrevoked at the time of Robert L. Rodman's death, but upon application for probate thereof it was held that it had not been legally executed, because not signed in the presence of two witnesses, and hence probate was refused. *Adams v. Rodman*, 102 Wis. 456. This action was commenced after the will was denied probate, and the plaintiff's claim now is that in 1873, when the contract or arrangement for operating the farm on shares was made between Robert L. Rodman and the plaintiff, it was also orally agreed that *Winfield* should continue to so operate the farm so long as his father lived, and should take care of his father and mother during their lives, and in consideration thereof that the father should leave him by will the "homestead farm," the "northwest eighty," and ten acres of the Sharon "wood lot," and that *Winfield* should pay to his sisters *Mary* and *Melissa* $1,000 each; and this is the alleged contract which the plaintiff is endeavoring to enforce.

The plaintiff could not testify to the making of the contract, and there was no witness in the case who testified directly to the making of any such contract, but a number of witnesses were called who testified to conversations at various times with Robert L. Rodman on the subject of *Winfield's* rights in the farm; the most definite of these conversations being that testified to by Mr. Seth Adams, the executor named in the subsequent will of 1881,— an old and

valued friend of Robert L. Rodman, who says that Robert came and told him of the execution of said will immediately after it was made, and then made the following statement:

"'I have given *Winfield* — made a bargain with *Winfield* that he should have — the 160 acres and homestead, the northwest eighty, and ten acres of timber over in Sharon, if he stays with us as long as we live, and works the farm on shares.' I think he says, 'under my instructions, while I live.' He told what he had given to the Greenman boys. I think it is 141 acres of prairie land, and also ten acres of timber over in Sharon; and he had given to Garrett and *Francis* the eighty acres next to *Francis's* land, and the east eighty north of the road, and had given them ten acres of timber apiece in Sharon; and *Winfield* was to pay the girls *Mary* and *Melissa* $1,000 each. I think I have stated substantially the conversation, as near as I can remember."

A number of other witnesses testified to having had conversations at various times with Robert in which he stated, in substance, that, if *Winfield* stayed at home and took care of him and his family, he was to have the homestead, or the homestead and the northwest eighty, or that he had an arrangement with *Winfield* to work the farm and take care of himself and wife as long as they lived, and he would have the old home and the northwest eighty, or words of somewhat similar import.

On the defendants' side there was testimony of certain admissions alleged to have been made by the plaintiff during or shortly after the conclusion of the will contest, one of which was testified to by *Dr. Rodman*, a brother of the deceased and the administrator of the estate, and consisted of a conversation with the plaintiff which took place during the will contest, in which he testifies that the plaintiff said "that, while he did not pretend that he was not getting more than his share of the estate,— more than he ought to have,— still he did not want to be blamed for it, because it was something he had nothing to do with. It was entirely his father's notion, giving him the largest share of the

estate." The plaintiff testifies that he does not remember having any such conversation. Another admission testified to by other witnesses was to the effect that the plaintiff said after the will contest was decided that he had no agreement with his father, except to work the land on shares.

The court found that the only agreement between the plaintiff and his father was an arrangement to work the farm on shares, and that there was no contract to will any part thereof to the plaintiff, and that the plaintiff never took possession of any part of the farm under such a contract. Upon these findings judgment was rendered for the defendants, and the plaintiff appeals.

For the appellant there was a brief by *Henry W. Weed*, attorney, and *Sanborn, Luse & Powell*, of counsel, and oral argument by *Mr. A. L. Sanborn* and *Mr. Weed*.

For the respondents there was a brief by *Fethers, Jeffris & Mouat*, and oral argument by *M. G. Jeffris* and *M. O. Mouat*.

WINSLOW, J. The fact that Robert L. Rodman desired to leave to the plaintiff the largest and best part of his estate is rendered certain by the fact that he executed (or supposed that he executed) a will to that effect in 1881, when he was in full health and strength, which remained unrevoked, and which failed to be effective by no fault of his. *Adams v. Rodman*, 102 Wis. 456. That he had sufficient ground for so discriminating in favor of his youngest son appears satisfactorily from the evidence in this case. That son had for twenty-two years operated his father's farm on shares, returning to his father a good profit, relieving him from care and labor, and ministering to him faithfully in his declining years. It is to be regretted that the wishes of the testator, which were entirely reasonable and which he endeavored to place in legal and binding form, failed to become effective by reason of a failure to properly witness the

will, of which he knew nothing. These matters, however, are of little moment in the consideration of the issues of this case. True, the fact that a will was signed by Rodman in which the property which it is claimed he contracted to will to the plaintiff eight years previously was, in form, devised to the plaintiff, is undoubtedly a fact which may be considered upon the question whether any such contract was in fact made. Still it cannot be considered as controlling, or even as very persuasive. It is matter of common knowledge and experience that, while wills are frequently made, contracts to make a will in a certain way are very infrequent, and for very obvious reasons. Nor is the question one which we are to consider and determine from the evidence as an original proposition. It has been considered and determined by the trial court, and that decision cannot be set aside unless it be found against the clear preponderance of the evidence.

The trial court found, after reviewing all the evidence, that no such contract as the plaintiff claims was ever made; and, after due and careful examination of all the evidence, we are unable to say that this conclusion is against the weight of the evidence. It is true that there was considerable evidence, in the way of conversational admissions by the testator with various persons, which tended more or less strongly to indicate that the testator had some agreement with his son to leave him the home farm and the other lands now claimed; but, on the other hand, it is to be observed that nearly or quite all of such alleged admissions may as logically be referred to the will as to the supposed contract. Again, there are undisputed circumstances which tend to throw doubt on the existence of such a contract. For example, the contract is said to have been made in 1873, but no will was executed to carry it out until eight years had elapsed, during all of which time, apparently, a will was in existence, unrevoked, entirely at variance with the contract,

which gave *Winfield* only the home farm and a part of the wood lot, but no part of the northwest eighty. Again, the only reason assigned by the testator for the making of the new will in 1881 was the fact that the executor appointed under the former will had died. Again, it appears without dispute that *Winfield* owed his father something like $4,000 in 1886, and that a serious difficulty arose between himself and his father out of the collection of some money by *Winfield* arising from the sale of crops, which difficulty progressed so far that the father announced that *Winfield* must leave the farm and pay what he owed. ·Thereupon *Winfield* arranged to leave the place, and entered into negotiations for the hiring of another farm. The difficulty was subsequently patched up by the efforts of the two older sons, but the very significant circumstance in connection with the whole affair is that it does not appear that *Winfield* at this time made any claim that he had any contract rights, but prepared to leave without objection or protest.

Adding to these facts the testimony as to admissions made by *Winfield* to *Dr. Rodman* during the progress of the will contest, and the admissions to other parties after the contest was concluded, both of which are referred to in the statement of facts, there seems certainly to be sufficient evidence from which the trial court was entitled to conclude, as it did, that no contract to will any property to the plaintiff was ever made.

Another question was presented and argued, namely, the question whether specific performance could be enforced in any event, on account of the fact that the plaintiff never was given exclusive possession of the premises under his alleged contract. This court has certainly taken the ground that an oral agreement to devise lands in consideration of services to be performed is not taken out of the statute of frauds by the mere performance of the services, although they be of a personal nature. *Ellis v. Cary*, 74 Wis. 176;

*Martin v. Martin's Estate*, 108 Wis. 284. While there are decisions to the contrary in other jurisdictions, they were distinctly disapproved in the *Martin Case*, and we see no reason now to review the question. In the case of *Ellis v. Cary, supra*, it is intimated that, if the promisee under such a contract were put in possession by the promisor under the contract, a proper case for specific performance would arise. In the present case, however, Robert L. Rodman remained in possession of the property until his death, exercising all the rights of ownership. It is true that plaintiff also lived upon the premises, but such possession as he had was subordinate to his father's superior possession and was plainly due to the sharing agreement and not to the alleged contract to will.

*By the Court.*— Judgment affirmed.